UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                     Case Number 09-20536-11-BC
v.                                      Honorable Thomas L. Ludington

EARL BLOUNT,

        Defendant.
_____ /

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS AND DIRECTING SUPPLEMENTAL BREIFING

On November 9, 2009, a grand jury in the Eastern District of Michigan returned a forty-nine-count indictment against fifteen defendants accused of conspiring to distribute cocaine and cocaine base near Bay City, Michigan in violation of 21 U.S.C. §§ 841(a)(1) and 846. When the grand jury issued a second superseding indictment on August 5, 2010, the alleged conspiracy grew to include twenty-five defendants and fifty-eight criminal charges. [Dkt. # 182].

One of those defendants is Earl Blount, who on March 24, 2011 filed a motion to suppress evidence arising from two encounters he had with police officers in January and August 2009. Defendant Blount is charged in the second superseding indictment [Dkt. # 182] with conspiracy to distribute cocaine base (count 1), conspiracy to distribute cocaine (count 2), distribution of cocaine base (counts 4, 6, 10), and possession with intent to distribute cocaine base (counts 26, 50), all in violation of 21 U.S.C. § 841(a)(1). He is also named in count 58, seeking forfeiture of property derived from or related to the charged offenses pursuant to 21 U.S.C. § 853.

In his motion, Defendant seeks to suppress evidence seized during two arrests that he

contends were unlawful.  The first arrest occurred on January 27, 2009; the second on August 17, 2009.  He also seeks to suppress statements he made to police officers following those arrests.  The Court held an evidentiary hearing on Wednesday July 13, 2011 at 2:00 p.m.  During the hearing, both Defendant and the arresting officer, David Petro, offered testimony concerning the circumstances of the arrests.  Defendant and a special agent with the Federal Bureau of Investigation, Andrea Kinzig, also testified concerning the statements Defendant made to investigators following each arrest.  For the reasons explained below, Defendant's motion will be granted in part and denied in part.

## I.

Defendant was arrested by Petro and another officer, Rodrick Schanck, on two separate occasions.  Each arrest will be considered separately.

### A.

On January 27, 2009 shortly before 6:00 p.m., Defendant was walking down a sidewalk in Bay City near the intersection of Columbus Avenue and VanBuren Street.  [Dkt. # 346-1].  He was talking on a cell phone.  It was a cold day, even when compared to a typical Michigan winter day. The amount of drug-related activity in the area where Defendant was walking is higher than in other parts of the City.  As Defendant walked west down the sidewalk bordering Columbus Avenue, he occasionally looked behind him and around at his surroundings.  There were no other pedestrians or cars in the area.

Two Bay City police officers, Schanck and Petro, approached Defendant in a marked patrol car traveling east, the opposite direction as Defendant was walking.  Schanck and Petro turned behind Defendant, coming to a stop on a side street as Defendant continued to walk west, away from

them.  Schank and Petro exited the police car wearing their "Viper Unit" uniforms.  The Viper Unit

is a dedicated anti-narcotic unit that works closely with federal authorities.  Members of the Viper

Unit do not wear regular uniforms.  Rather, they wear black sweatshirts emblazoned with "POLICE"

on the front in white capital letters.  They also wear vests over their uniforms featuring the same

"POLICE" lettering on the back.

After Schanck and Petro exited the car, Schanck yelled to Defendant that they wanted him

to stop so that they could speak to him.  Defendant contends Schanck yelled "stop."  Schanck

remembers yelling "hi" or "hey."  Regardless, it is clear from the testimony that Schanck indicated

in a commanding tone that he wanted Defendant to stop so that the officers could speak to him.

Defendant stopped, turned around, and waited for Schanck and Petro to approach.

As they approached, Schanck asked Defendant what he was doing.  Defendant told them he

was out for a walk.  Schanck asked Defendant for his name, and Defendant responded truthfully.

Schanck recognized the name "Earl Blount" as a "person of interest" in a large, ongoing narcotics

investigation that eventually led to the indictments in this case.  Schanck then asked Defendant for

identification, and Defendant produced a Michigan identification card.  Without asking, one of the

officers returned to the patrol care and ran the card through the LEIN database and discovered that

Defendant was on parole.  The officer who returned to the car was absent approximately two

minutes to perform the background check.  During that time, he retained possession of Defendant's

identification card.

Defendant placed his hands in his pockets during the encounter with the officers.  The

officers asked Defendant to keep his hands out of his pockets, but he placed his hands in his pockets

again.  Petro asked Defendant if "he had any drugs on him and [Defendant] stated that he had a

-3-

little."  Schank then searched Defendant and discovered a small amount of crack cocaine in his left front coat pocket.  The officers then handcuffed Defendant and searched him more thoroughly.  The officers discovered $932 in U.S. currency, several sheets of paper with names and phone numbers, and a larger amount of crack cocaine in Defendant's pockets.

Defendant was taken to the FBI office in Bay City at approximately 6:00 p.m.  He signed a written form waiving his *Miranda* rights and provided a statement to the FBI agents, including Kinzig.  Defendant also signed a consent form, permitting the FBI to search his cell phone. Defendant was released from custody later than evening after he agreed to cooperate with the FBI's ongoing investigation.  After he was released, however, he eventually declined to provide further assistance.

The Fourth Amendment prohibits "unreasonable searches and seizures."  U.S. Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

> Encounters between police officers and citizens can be grouped into three categories: consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause.

*United States v. Campbell*, 486 F.3d 949, 953–54 (6th Cir. 2007) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir.1994)) (quotation omitted).

Defendant contends that the January 27, 2009 encounter began with a *Terry* stop that was not justified by reasonable suspicion, and escalated into an arrest.  Defendant contends that all the fruits of the illegal stop should be suppressed.  The government contends that the encounter began with a casual conversation and escalated to an arrest only after Defendant admitted he possessed drugs, which is a crime under Michigan law and provided the officers with probable cause to make

-4-

an arrest.

"[L]aw enforcement officers do not violate the Fourth Amendment merely by approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen . . . ." *Campbell*, 486 F.3d at 954 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). The key issue to determining whether an encounter between a person and a police officer is the type of casual encounter that does not require reasonable suspicion, or a *Terry* stop that does require reasonable suspicion, is whether a reasonable person in the circumstances would have believed that he was free to walk away. *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004).

The testimony demonstrates that a reasonable person in Defendant's circumstances "would not have felt free to terminate the encounter." *Id.* Defendant was the only person walking down a street on a cold January evening near dark when two police officers pulled up behind him, exited the car wearing unique uniforms with vests on the outside, and yelled in his direction. In such a situation, it is questionable whether a reasonable person would consider himself free to simply walk on and ignore the officers' request. Moreover, after the officers approached, they not only asked for his name, what he was doing, and for identification, but took the identification, which confirmed Defendant provided an accurate name, back to the police car with them to conduct a background check. The officers did not ask Defendant for permission to return with his identification to the patrol car to conduct the check. When the officer left with the identification, Defendant was no longer free to leave.

The government contends that a factually indistinguishable Sixth Circuit case demonstrates that a reasonable person in Defendant's situation would have believed he was free to leave up until

the point where he admitted to possessing narcotics.  In *United States v. Campbell*, an Ohio police officer on routine patrol in a marked car followed a black chevy into the parking lot of a closed building supply store at 10:30 p.m. on a Friday evening in July.  486 F.3d at 951–52.  There had recently been a "rash" of break-ins in the area.  *Id.*  A man got out of the car, talking on his cell phone, and wandered through the building supply store's parking lot and into the parking lot of stationary manufacturer, which was also closed.  *Id.* at 952.  As Campbell was standing in the parking lot talking on the phone, the officer approached him and "asked him if everything was okay."  *Id.*  Campbell responded that he was looking for his girlfriend's workplace, Treeman Industries, and that he was lost.  *Id.*  Campbell then handed the cell phone to the officer without being asked and the woman on the line confirmed that she was Campbell's girlfriend and that she worked at Treeman Industries.  *Id.*  The officer contacted his dispatcher, obtained the address for Treeman Industries, returned the cell phone to Campbell, and provided Campbell with the address. *Id.*

    The officer then explained that there had been a number of burglaries in the area, and asked if he could see Campbell's identification, "just to log that I talked to him."[1]  *Id.*  Campbell became nervous, and told the officer he did not have any identification.  *Id.*  It is a crime in Ohio for the operator of a motor vehicle to decline to produce a driver's license when asked to do so by a police officer.  Ohio Rev. Code § 4507.35.  The officer then asked for Campbell's name, birth date, and social security number, and later told Campbell he would be permitted to leave as soon as he had been identified.  *Id.*  Campbell, increasingly nervous, provided an alias, a fake birth date, and

---

[1] One of the three panel members dissented, based on his conclusion that the officer did not "ask" for identification, but demanded that it be provided before Campbell would be permitted to leave.  *Campbell*, 486 F.3d at 958–59 (Cole, J., dissenting).

indicated that he did not know his social security number.  *Id.*  The officer again contacted the dispatcher, who was unable to confirm the name and birth date.  *Id.*  The officer, now suspicious, asked to search Campbell.  *Id.*  Campbell consented, and was arrested after the officer discovered marijuana in his pants pockets.  *Id.* at 952–53.  A later search of the black Chevy revealed a loaded handgun under the front seat and Campbell was charged with possession of a firearm by a convicted felon.  *Id.* at 951.

The district court granted Campbell's motion to suppress, concluding that even if the initial stop was consensual, it became a *Terry* stop when the officer asked for identification, and that the officer lacked reasonable suspicion that a crime had been committed or was being committed when he asked for identification.  *Id.* at 955–56.  The Sixth Circuit reversed, concluding that a mere request for identification is not a seizure.  *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 437 (1991); *INS v. Delgado*, 466 U.S. 210, 216 (1984)).  The Sixth Circuit emphasized that when Campbell declined to produce an identification, the officer had probable cause to believe Campbell had violated Ohio law by operating a motor vehicle without a driver's license in his possession and the subsequent seizure was justified.  *Id.* at 957.

In this case, considering "all the circumstances surrounding the encounter," as the Court must, *Bostick*, 501 U.S. at 439, Defendant was seized at the point where one of the officers returned to the patrol car with his identification to perform a background check.  First, the initial encounter was, if not a stop, less casual than the initial encounter in *Campbell*.  Rather than silently approaching a man standing still and talking on a cell phone, the officers came to a stop behind a man who was walking away from them, jumped out of the car wearing nonstandard uniforms, and called "hey" or "stop" in a commanding tone.  *Cf. United States v. Matthews*, 278 F.3d 560, 561, 562

(6th Cir. 2002) (concluding that officer who called out "Hey, buddy, come here." did not seize the person he called out to because the question was merely a "request to come hither" and not a command).  Moreover, Defendant was polite throughout the encounter, providing prompt and truthful answers to each of the officers' questions.  Unlike Campbell, Defendant did not lie or claim he did not have identification.  Additionally, unlike Campbell who was in an empty parking lot at 10:30 p.m., Defendant was walking down a residential street before dark.  After asking for Defendant's identification, examining it, and determining that Defendant was truthful in his responses, the officers nevertheless took the identification without asking permission and returned to the patrol car for approximately two minutes to perform a background check.  At that point, Defendant was seized.  A reasonable person in such a situation would not have felt free to intercept the officer, take his identification back, and walk away.  *See United States v. Williams*, 615 F.3d 657, 661–62 (6th Cir. 2010) (concluding that a reasonable person would not have felt free to leave upon being approached by two uniformed officers, singled out of a group, and accused of a crime).

After Defendant had been seized, he admitted in response to an officer's question that he had drugs with him.  As the government emphasizes, the admission established probable cause for a warrantless arrest.  *See Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998) ("Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." (citations and quotations omitted)).  The admission, however, came after Defendant was seized, and therefore does not provide the justification that would be necessary for the seizure.

Having concluded that Defendant was seized at the point at which the officers returned to the police car to check his identification, the next question is whether the officers had reasonable

-8-

suspicion that a crime had been committed or was being committed when they seized Defendant. *See Terry*, 392 U.S. at 27.  As an initial matter, the government did not argue in its brief or at the evidentiary hearing that there was reasonable suspicion at the time the officers approached Defendant or when they took his identification to the police car for the background check.  Rather, the government's only contention was that Defendant was not seized until he admitted he possessed narcotics.  Nevertheless, it is clear from the facts that the officers lacked reasonable suspicion at the time of the seizure.[2]  Although Defendant looked behind him when he was walking, the area was known for narcotics trafficking, and the officers recognized his name as a person of interest in an ongoing narcotics investigation, Defendant was polite and honest when the officer's approached him.  Moreover, it was not particularly late in the day, and it is not unusual or suspicious that Defendant chose to place his hands in his pockets on a cold day in late January.  Ultimately, Defendant's behavior at the time the officer's approached him did not justify a stop, and the additional fact that he was a person of interest in the investigation did not provide the officers with authorization to detain him for the purposes of further investigation.  *See United States v. Blair*, 524 U.S. 740, 750–51 (6th Cir. 2008).  Accordingly, there was not reasonable suspicion for an investigatory stop at the time of the seizure.

" '[A]ll evidence obtained by an unconstitutional search and seizure [is] inadmissible in

---

[2] Notably, Petro testified that he believed there was reasonable suspicion to stop Defendant at the time he first approached Defendant based only on Defendant's presence in a neighborhood where narcotics are relatively more prevalent compared to other neighborhoods and the fact that he occasionally looked behind him.  The government understandably does not advance this position before the Court.  *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (concluding presence in a high crime area and nervousness are both factors an officer may consider in determining reasonable suspicion, but neither, standing alone, establishes the necessary predicate for a *Terry* stop) (citations omitted).

federal court regardless of its source.' " *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008) (quoting *Mapp v. Ohio*, 367 U.S. 643, 654 (1961)) (second alteration in original).  Moreover, "evidence which police derivatively obtain from an unconstitutional" seizure is also barred pursuant to the "fruit of the poisonous tree" doctrine.  *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963)).  Thus, the crack cocaine, U.S. currency, and other evidence which was seized from Defendant following his arrest is not admissible under *Mapp*.  367 U.S. 654.

Whether the statement Defendant provided to the FBI less than an hour later and the information the FBI obtained from a search of Defendant's cell phone should be suppressed, however, is a more difficult question.  Between the illegal seizure and the time that Defendant gave the statement and the FBI searched the phone, two intervening events took place.  First, Defendant signed a form indicating that he understood he had a right to remain silent and a right to a lawyer, and that he was waiving those rights in order to speak with the FBI agents.  The form signed by Defendant continues: "I understand and know what I am doing.  No promises or threats have been made to me and no pressure or coercion of any kind has been used against me."  Gov't Ex. 1. Second, Defendant signed a consent form, authorizing the FBI to perform a "complete" search of his cell phone.  The consent form notes that Defendant was advised of his right to refuse consent, and nevertheless chose to give his "permission voluntarily."  [Dkt. # 346-1].  Moreover, although the amount of time that passed between the illegal seizure and the statement was short, the "flagrancy of the official misconduct" was also slight.  *See Williams*, 615 F.3d at 669 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).

At the hearing on Defendant's motion to suppress, the government indicated its belief that the statement and cell phone search would still be admissible, even if the seizure was illegal, because

of the intervening waivers.  The issue, however, has not been briefed by either party.  Accordingly, supplemental briefing on whether the taint of the illegal seizure was removed by the time Defendant offered a statement and consented to the cell phone search will be directed.

### B.

On August 17, 2009, Schanck observed Defendant driving a car.  [Dkt. # 346-2].  He called Petro, who was patrolling in a different car, and the pair of officers followed Defendant to a party store and then to a residence near the intersection of North Linn Street and East Florence Street in Bay City.  The officers knew from their August encounter with Defendant that he did not have a driver's license.  They also knew that he had not had a license since 1993, when it was suspended. Petro further testified that the license was revoked a year later, in 1994, and that when a license is revoked it is more difficult to get it restored compared to when a license is suspended.  Indeed, Defendant attempted to restore his license in 2008, and the request was denied.

In addition to the officers' knowledge about Defendant's license from their earlier encounter, Kinzig testified that the FBI was monitoring Defendant's LEIN report in conjunction with their narcotics investigation.  Kinzig testified that she would be informed anytime that an officer ran a LEIN report on Defendant and anytime something changed in the LEIN report.  Kinzig indicated that if Plaintiff's dirver's license had been restored, she would have learned of it and shared it with the officers who were assisting with the investigation, including Petro and Schanck.  Kinzig also indicated that approximately two or three months before the August arrest, Defendant stopped communicating with the FBI.  Sometime later, her practice would have been to ask the officers participating in the narcotics investigation to arrest Defendant if they observed him engaging in illegal activity, including driving without a license.  Petro did not testify that Kinzig asked the

officers to look for Defendant and arrest him.

After the car stopped at the residence near the intersection North Linn and East Florence, Defendant got out and walked toward the residence. Petro pulled up behind the vehicle Defendant was driving, got out of his vehicle, and directed Defendant and his passenger to face the residence and put their hands against the wall. Petro testified that his intention was to investigate whether Defendant was driving without a license. When Petro approached Defendant, however, he observed a prescription pill bottle with plastic bags inside of it protruding from Defendant's front pocket. Petro then attempted to arrest Defendant for possession of narcotics. Following a struggle, Defendant was handcuffed and the officers discovered crack cocaine in the pill bottle. Without first reading Defendant his *Miranda* rights, the officers asked whether he used crack, sold crack, or both. Defendant admitted to selling crack and using crack.

The government contends that the officers had reasonable suspicion to stop Defendant because they knew he did not have a driver's license and driving without a license is a violation of Michigan law. Defendant contends that the officers' knowledge of Defendant's license status, which had been acquired in January—seven months earlier—was stale and did not constitute reasonable suspicion.

"When a police officer conducts a brief investigatory stop of a person in a vehicle, 'the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot.' " *United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004) (quoting *United States v. Ridge*, 329 F.3d 535, 540 (6th Cir. 2003) (citation omitted)); *see also Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has

-12-

occurred."). Here, because Defendant was driving without a license and following the stop Petro immediately observed evidence of narcotics, Petro and Schanck had both reasonable suspicion to stop him and probable cause to arrest him as long as the information they had about his driver's license status was not too stale.

In *Sandridge*, the Sixth Circuit concluded that evidence of a suspended driver's license was not stale for the purposes of stopping a driver who was suspected of driving without a license where the officer had checked the validity of the license twenty-two days earlier. 385 F.3d at 1033–36. The Sixth Circuit emphasized that because driving without a license is a "continuing violation," the officer was permitted to "briefly" stop Sandridge again after a three-week lapse in time to "determine whether the crime was still being committed." *Id.* at 1036. The government suggests that in this case, the same reasoning applies even though there was a significantly longer gap between the time that the officer checked Defendant's license and the time Defendant was arrested the second time. The government emphasizes that Defendant's license was not just suspended, as in *Sandridge*, but revoked, and that it had been revoked for more than fifteen years. Moreover, the FBI was monitoring Defendant's LIEN report and would have informed the officers if Defendant's license was restored.

Defendant, however, suggests that the significant delay between the previous stop and the August arrest means that the information was too stale to constitute reasonable suspicion, and that *Sandridge* is distinguishable. In *United States v. Laughrin*, 438 F.3d 1245, 1248 (10th Cir. 2006), the Tenth Circuit concluded that the officer's evidence that the suspect had a suspended driver's license was too stale where the officer had stopped the suspect several times before but the most recent stop had been twenty-two weeks earlier. In *United States v. Bunton*, No. 2:09-CR-106, 2010

-13-

WL 2082642, at *3 (E.D. Tenn. May 24, 2010), a judge in the Eastern District of Tennessee distinguished *Sandridge*, concluding the officer's information about the suspect's driver's license was too stale where the officer's most recent contact with the suspect was three years earlier.

In this case, the information that the officers had about Defendant's driver's license was sufficiently current for them to conduct an investigatory stop to confirm whether he was a licensed driver. Unlike *Sandridge* and *Bunton*, Defendant's license was revoked, not just suspended. Moreover, it had been revoked for more than fifteen years and Defendant's recent attempts to restore it had been rejected by the State of Michigan. Importantly, Defendant was also being monitored by the FBI in conjunction with the narcotics investigation and the arresting officers would have known if the license had been restored.

After permissibly stopping Defendant to investigate his driver's license status, Petro immediately observed that Defendant had what appeared to be bags of narcotics in his pocket. At that time, it was appropriate to initiate an arrest. The evidence seized from Defendant in August will not be suppressed.

Finally, the officers questioned Defendant after he was arrested. During the questioning, Defendant admitted that he used and sold crack cocaine. The government concedes that the statements made by Defendant should not be admitted, even though the evidence surrounding the arrest is admissible, because Defendant was not read his *Miranda* rights before he was questioned.

**II.**

Accordingly, it is **ORDERED** that Defendant's motion to suppress [Dkt. # 346] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that evidence obtained from the search of Defendant following his

-14-

January arrest and his statement to officers following his August arrest are not admissible.

It is further **ORDERED** that Defendant shall submit a supplemental brief on or before **August 19, 2011** explaining whether or not Defendant's statements to police on January 27, 2009 and the information obtained from the search of his cell phone are admissible. The government shall submit a response on or before **September 2, 2011**. The briefs shall not exceed ten pages.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: August 5, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 5, 2011.

s/Tracy A. Jacobs
TRACY A. JACOBS

---