UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.
        Case Number 09-20536-11-BC
        Honorable Thomas L. Ludington

EARL BLOUNT,

        Defendant.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS**

Police officers stopped Defendant Earl Blount without reasonable suspicion about half past five on the evening of January 27, 2009. When asked if he had any drugs on his person, Defendant acknowledged that he did. The officers then searched Defendant, found about five grams of crack cocaine, and placed him under arrest. The officers drove to the city police station. But knowing that Defendant was associated with an ongoing investigation being conducted by the Federal Bureau of Investigation into an alleged crack cocaine conspiracy, the officers ultimately transported Defendant to the FBI office at the direction of FBI agents. Once there, Defendant was placed into the custody of the FBI. The FBI asked Defendant if he was willing to discuss his knowledge of the principal target of their investigation, Eric Marshall. Defendant said that he was. A little after six o'clock, Defendant executed a *Miranda* waiver. He was then interviewed by the FBI for about two hours. During the course of the interview, Defendant agreed to cooperate with the FBI in its investigation. At the conclusion of the interview, Defendant consented to a search of his telephone and executed a written consent to the

search of the phone. Agents transported Defendant home. Several months later, Defendant's cooperation ceased. In August 2010, Defendant was indicted.

Following the indictment, Defendant moved to suppress the evidence obtained on January 27, 2009, including the physical evidence, the statements made at the scene of the arrest, the statements made to the FBI, and the information obtained from his telephone. By previous order of this Court, the physical evidence and the statements made at the scene of arrest were suppressed. The issues now before the Court are whether the statements made to the FBI and the information downloaded from the phone were obtained under later circumstances sufficiently attenuated from the earlier stop to reflect independent acts of free will. For the following reasons, they were. Accordingly, statements made by Defendant to the FBI and the information obtained from the search of his cellular phone are admissible.

## I.

### A.

About half past five on the evening of January 27, 2009, Defendant was walking down a sidewalk in Bay City near the intersection of Columbus Avenue and VanBuren Street. He was talking on a cellular phone. It was a cold evening, even when compared to a typical Michigan winter evening. The amount of drug-related activity in the area where Defendant was walking was higher than in other parts of the City. As Defendant walked, he looked from side to side and behind him. There were no other pedestrians or cars in the area.

Two Bay City police officers, Rodrick Schanck and David Petro, approached Defendant in a marked patrol car traveling east, the opposite direction as Defendant was walking. Thinking Defendant appeared suspicious, Schanck and Petro turned behind Defendant, coming to a stop on

a side street. Defendant continued to walk west, away from them. Schank and Petro exited the police car wearing their "Viper Unit" uniforms with "POLICE" emblazoned on the front and the back. The Viper Unit is a dedicated anti-narcotic unit that works closely with federal authorities.

After Schanck and Petro exited the car, Schanck yelled to Defendant. Defendant contends Schanck yelled "stop." Schanck remembers yelling "hi" or "hey." Regardless, it is undisputed that Schanck indicated in a commanding tone that he wanted to speak with Defendant. Defendant stopped, turned around, and waited for Schanck and Petro to approach.

As they approached, Schanck asked Defendant what he was doing. Defendant told the officers that he was out for a walk. Schanck asked Defendant for his name, and Defendant responded truthfully. Schanck recognized the name "Earl Blount" as a "person of interest" in a large, ongoing narcotics investigation that eventually led to the twenty-five indictments in this case. Schanck then asked Defendant for identification, and Defendant produced a Michigan identification card. Without asking, Petro returned to the patrol car and entered the card's information into the Law Enforcement Information Network database. Petro was in the patrol car about two minutes. During that time, he retained possession of Defendant's identification card.

Returning from the car, Petro asked Defendant "if he had any drugs on him or anything else on him." Mot. to Suppress Hr'g Tr. 14:3–5, July 13, 2011, ECF No. 465 ("July Hr'g"). "I have a little bit," Defendant responded. July Hr'g 14:13. Schank searched Defendant and discovered a small amount of crack cocaine in his left front coat pocket. Handcuffing Defendant, the officers then searched him more thoroughly. The officers discovered $932, several sheets of paper with names and phone numbers, and about five grams of crack cocaine in

Defendant's pockets.  Placing Defendant under arrest, the officers confiscated Defendant's cellular phone.  Their notes reflect that they placed Defendant under arrest at 5:41 p.m.

The officers initially transported Defendant to the Bay City Police Station.  "We pulled into the Bay County jail," Defendant recalls, "stopped, and then for maybe like a minute or two I believe Officer Petro was on the phone, and then we pulled out and we went to the FBI location."  July Hr'g 74:10–13.  Defendant arrived at the FBI office in Bay City about six o'clock.  The officers removed his handcuffs and escorted him to an interview room.  Two individuals were waiting — a special agent of the FBI, Andrea Kinzig, and a sergeant of the Bay City Police Department assigned to an FBI task force, Gregory Potts.  Schanck and Petro gave Defendant's cellular phone to Kinzig and Potts and departed, leaving Defendant alone in the room with the two federal agents.  Defendant recounts what happens next:

> They let me know — they said that I wasn't dealing with the Bay City Police Department anymore, it was the FBI, and they asked me my involvement with Eric Marshall.  At that time they asked me was I willing to talk to them about my involvement with Eric Marshall.  I told them that I was, and they had me sign the paper.

July Hr'g 74:19–24.  "Why were you willing to do that?" the Court inquired at the first evidentiary hearing held on the instant motion to suppress.  July Hr'g 74:25.  "At that time I knew certain things were going on," Defendant explained, continuing: "I had just been released from prison, I had been free for about six months and I didn't want to go back, so I was willing to talk to them with the hopes that my statements to them would help me from not going back to prison."  July Hr'g 75:1–5.

The "paper," a *Miranda* waiver, provided the familiar notices of rights and further provided "I understand and know what I am doing.  No promises or threats have been made to

-4-

me and no pressure or coercion of any kind has been used against me." Pl.'s Opp'n Mot. Suppress Ex. 1, ECF No. 346-1. Defendant signed the waiver at 6:01 p.m. Inquiring whether Defendant's waiver was knowingly, intelligently, and voluntarily made, the government asked at the second of the evidentiary hearings on the instant motion: "[Y]ou're in the FBI office and they hand you a *Miranda* form. And you — you know from your experience that you have a choice at that point, correct?" Mot. to Suppress Hr'g Tr. 57:6–9, Oct. 19, 2011 ("Oct. Hr'g"). "Right," Defendant responded. Oct. Hr'g 57:10.

During the interview with the FBI, Defendant agreed to cooperate in its investigation. At the conclusion of the interview, Defendant consented to a search of his cellular phone. That night, Defendant was transported home; he was not placed into custody. Over the next several months, he met with FBI agents several times (specifically, on February 5 and 10; March 2, 16, 29, and April 7 and 18) making calls to Eric Marshall and attempting to arrange a controlled purchase from Mr. Marshall.

In April 2009, Defendant was stopped by a Bay City police officer. Although Defendant's license had been revoked in 1994, after Defendant notified the officer that he was working with the FBI, he was released with a ticket. Around this time, the cooperative relationship between Defendant and the FBI ended.

On August 17, 2009, Defendant was again arrested by officers Schanck and Petro. While patrolling, Schanck observed Defendant driving. He called Petro, who was patrolling in a different car, and the pair followed Defendant to a party store and then to a residence. The officers knew from their January encounter with Defendant that he did not have a driver's license. They also knew that he had not had a license since 1993, when it was suspended. And

they knew that the license was revoked a year later, in 1994, and that when a license is revoked it is more difficult to get it restored compared to when a license is suspended. Indeed, Defendant attempted to restore his license in 2008, and the request was denied. In addition to the officers' knowledge about Defendant's license from their earlier encounter, the FBI was monitoring Defendant's Law Enforcement Information Network report as part of its Marshall investigation. At the first evidentiary hearing, Agent Kinzig testified that she was informed anytime that an officer ran a report on Defendant and anytime something changed in his report. Kinzig also testified that if Defendant's license had been restored, she would have learned of it and shared it with the officers who were assisting with the investigation, including Schanck and Petro.

After Defendant arrived at the residence, he exited the vehicle and walked toward the residence. Petro pulled up, exited his vehicle, and ordered Defendant and his passenger to face the residence and put their hands against the wall. Petro testified that his intention was to investigate whether Defendant was driving without a license. When Petro approached Defendant, however, he observed a prescription pill bottle with plastic bags inside of it protruding from Defendant's front pocket. Petro then attempted to arrest Defendant for possession of narcotics. Following a struggle, Defendant was handcuffed and the officers discovered crack cocaine in the pill bottle. Without first reading Defendant his *Miranda* rights, the officers asked whether he used or sold crack cocaine. Defendant admitted to both selling and using crack cocaine.

## II.

In November 2009, a grand jury in the Eastern District of Michigan returned a forty-nine-count indictment against fifteen defendants accused of conspiring to distribute cocaine and

cocaine base near Bay City, Michigan in violation of 21 U.S.C. §§ 841(a)(1) and 846. When the grand jury issued a second superseding indictment on August 5, 2010, the alleged conspiracy grew to include twenty-five defendants and fifty-eight criminal charges. ECF No. 182. One of those defendants is Earl Blount, who is charged in the second superseding indictment with conspiracy to distribute cocaine base (count 1), conspiracy to distribute cocaine (count 2), distribution of cocaine base (counts 4, 6, 10), and possession with intent to distribute cocaine base (counts 26, 50), all in violation of 21 U.S.C. § 841(a)(1). He is also named in count 58, seeking forfeiture of property derived from or related to the charged offenses pursuant to 21 U.S.C. § 853.

On March 24, 2011 Defendant filed a motion to suppress all evidence arising from the arrests on January 27, 2009, and August 17, 2009. ECF No. 346. The Court held its first evidentiary hearing on Wednesday, July 13, 2011. On August 5, 2011, the Court issued an order granting in part and denying in part Defendant's motion. *United States v. Blount*, No. 09-20536, 2011 WL 3426189, at *7 (E.D. Mich. Aug. 5, 2011), ECF No. 415. Regarding evidence arising out of the arrest on January 27, 2009, the Court concluded that Defendant's behavior at the time the officers approached him did not justify the officers stopping him. The Court further concluded that Defendant was seized when the officers took his identification information from him without asking permission and an officer returned to the patrol car for approximately two minutes to perform a background check. Accordingly, the evidence seized from Defendant during the arrest on January 27, 2009, and any statements made at the scene were suppressed.

Regarding evidence arising out of the arrest on August 17, 2009, the Court concluded that the officers had both reasonable suspicion to stop Defendant and probable cause to arrest him.

The information that the officers had about Defendant's driver's license was sufficiently current for them to conduct an investigatory stop and, after permissibly stopping Defendant to investigate his driver's license status, Petro immediately observed that Defendant had what appeared to be bags of narcotics — a prescription pill bottle with plastic bags inside — protruding from his pocket. At that time, it was appropriate to initiate an arrest. Accordingly, the Court did not suppress the narcotics found in Defendant's possession. In contrast, Defendant's responses to the officers' questions — that he sold and used crack cocaine — were suppressed because Defendant was not provided his *Miranda* rights before he was questioned.

Supplemental briefing was requested regarding the admissibility of statements made at the FBI's office following the arrest of January 27, 2009, and information downloaded from Defendant's cellular phone. In their papers, the parties largely agreed that the question is whether the connection between the stop and arrest and the information obtained in the later FBI interview is sufficiently attenuated to reflect an independent act of free will. A second evidentiary hearing was held on October 18, 2011. At the conclusion of the hearing, the Court took the matter under advisement. For the reasons which follow, Defendant's motion to suppress this evidence will be denied.

### III.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. As a general matter, "all evidence obtained by an unconstitutional search and seizure is inadmissible in federal court regardless of its source." *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008) (internal alteration omitted) (quoting *Mapp v. Ohio*, 367 U.S. 643, 654 (1961)). "The animating purpose underlying the exclusionary rule is the deterrence of unlawful

government behavior." *United States v. Gross*, __ F.3d __, __, 2011 WL 5456694, at *5 (6th Cir. June 15, 2011) (citing *Elkins v. United States*, 364 U.S. 206, 217 (1960)). Elaborating on the scope of the rule, Justice Oliver Wendell Holmes, Jr. writes:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

*Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920). Consistent with this logic, the exclusionary rule "excludes from a criminal trial any evidence seized from the defendant in violation of his Fourth Amendment rights. Fruits of such evidence are excluded as well." *Alderman v. United States*, 394 U.S. 165, 171 (1969) (citing *Silverthorne Lumber*, 251 U.S. at 391–92). Likewise, "the indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *New York v. Harris*, 495 U.S. 14, 19 (1990).

Consequently, under well-established precedent statements made by a wrongfully arrested defendant must be suppressed unless the government establishes that the statements were "an act of free will sufficient to purge the primary taint of the unlawful invasion." *Kaupp v. Texas*, 538 U.S. 626, 632 (2003) (per curiam) (internal alteration omitted) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). As formulated in *Wong Sun*, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488. Put differently,

the question is the extent of "the causal connection" between the illegality and the subsequently obtained evidence. *Dunaway v. New York*, 442 U.S. 200, 217 (1979) (quoting *Brown v. Illinois*, 422 U.S. 590, 603 (1975)); *see also Gross*, 2011 WL 5456694, at *5 (noting that the Court has "declined to adopt a *per se*, or but for, rule that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." (internal quotation marks omitted) (quoting *United States v. Ceccolini*, 435 U.S. 268, 276 (1978))). The court must ask whether, under the totality of the circumstances, the government has demonstrated "sufficient 'attenuation' to break the connection between the illegal arrest and the [subsequent statement]." *Taylor v. Alabama*, 457 U.S. 687, 693 (1982).

Factors to consider in determining if the consent is sufficiently attenuated from the illegal seizure include the "observance of *Miranda*," *Kaupp*, 538 U.S. at 633, "the temporal proximity of the arrest and the [statement], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Dunaway*, 442 U.S. at 218 (internal alterations omitted) (quoting *Brown*, 422 U.S. at 603–04). "No single factor in this analysis is dispositive of attenuation." *Gross*, 2011 WL 5456694, at *5 (citing *Brown*, 422 U.S. at 603). The government bears the burden of persuasion. *Kaupp*, 538 U.S. at 633.

**A.**

Regarding the first factor — the observance of *Miranda* — before the FBI began interviewing Defendant, he was read his *Miranda* rights and executed a waiver. Indeed, Defendant does not dispute that his waiver was knowingly, intelligently, and voluntarily made. This factor indisputably weighs in the government's favor. "In *Brown* and *Dunaway*," however,

-10-

the Court "firmly established that the fact that the [statements] may be 'voluntary' for purposes of the Fifth Amendment, in the sense that *Miranda* warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest." *Taylor v. Alabama*, 457 U.S. 687, 690 (1982). Consequently, the other factors must also be considered.

**B.**

Regarding the second factor, "there is no 'bright-line' test for temporal proximity." *United States v. Wolfe*, 166 F. App'x 228, 234 (6th Cir. 2006) (quoting *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003)). Attenuation, however, "ordinarily involves showing that there was some significant intervening time, space, or event." *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990) (quoting *United States v. Vasquez*, 638 F.2d 507, 528 (2d Cir. 1980)).

In *Brown v. Illinois*, 422 U.S. 590 (1975), for example, the Court concluded that the government had not met its burden of demonstrating attenuation when the defendant's "first statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever." *Id*. at 604. Crucial to the Court's holding, however, was that the illegal arrest "had a quality of purposefulness" — "The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives." *Id*. at 605.

Similarly, in *Taylor v. Alabama*, 457 U.S. 687 (1982), the Court found no attenuation when the interval was six hours between the illegal arrest and confession, explaining "a difference of a few hours is not significant where, as here, petitioner was in police custody, unrepresented by counsel, and he was questioned on several occasions, fingerprinted, and

subjected to a lineup." *Id*. at 691. Again crucial to the Court's decision was the flagrancy of the official misconduct — the defendant "was arrested without probable cause in the hope that something would turn up." *Id*.

In contrast, in *Rawlings v. Kentucky*, 448 U.S. 98 (1980), the Court concluded that the government had established attenuation between the initial wrongful seizure and the subsequent incriminating statement when the forty-five minute detention was in a "congenital atmosphere," the wrongful seizure was not a product of flagrant misconduct, and the defendant's admissions were "spontaneous reactions to the discovery of his drugs" rather than a product of the illegal detention. *Id*. at 108.

Turning to decisions of the Sixth Circuit, in *United States v. Lopez-Arias*, 344 F.3d 623 (6th Cir. 2003), the court concluded that the government had not met its burden of demonstrating attenuation when the interval was a half hour between the illegal seizure and consent. *Id*. at 630. Not only was there "no intervening time or event between the illegal arrest and defendants' consent," however, "the illegality of the arrest was blatant." *Id*.

Likewise, in *United States v. Buchanan*, 904 F.2d 349 (6th Cir. 1990), the court found no attenuation when about an hour elapsed from the illegal entry to the consent and the defendant "was handcuffed and seated in the family room of his house in the presence of several agents from the time of the entry until he signed the consent form." *Id*. at 356.

In this case, Defendant's first statement was separated from the wrongful stop by about a half hour. The temporal proximity factor indisputably weighs in his favor. This, again, is only one of several factors that must be considered.

## C.

Attenuation, of course, asks the question of what is the "the causal connection," if any, between the illegality and the subsequently obtained evidence. *Dunaway v. New York*, 442 U.S. 200, 217 (1979) (quoting *Brown v. Illinois*, 422 U.S. 590, 603 (1975)). "The type of intervening events that serve to attenuate official misconduct are those that sever the causal connection between the illegal arrest and the discovery of the evidence." *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003) (collecting cases).

In this case, several events occurred which severed the causal connection between the illegal arrest by the local law enforcement officers and the subsequent statements to the FBI agents. Following his arrest, Defendant was initially transported to the Bay City Police Station. Before he was removed from the vehicle, however, the officers decided to transport him to the FBI office. Once there, they surrendered custody of him to the FBI and left.

With that, Defendant's circumstances changed dramatically — he was no longer merely the subject of a relatively low level drug bust by local law enforcement, but a person of interest in a major federal investigation conducted by the FBI. And he recognized as much. In Defendant's words:

> They let me know — they said that I wasn't dealing with the Bay City Police Department anymore, it was the FBI, and they asked me my involvement with Eric Marshall. At that time they asked me was I willing to talk to them about my involvement with Eric Marshall. I told them that I was, and they had me sign the paper.

July Hr'g 74:19–24. "Why were you willing to do that?" the Court inquired. July Hr'g 74:25. "At that time I knew certain things were going on," Defendant explained. July Hr'g 75:1–5. What he knew — or quickly concluded — was that the FBI not only knew who he was, but also

-13-

knew who Eric Marshall was, and knew he knew something of Mr. Marshall's organization. And, of course, he knew — or quickly concluded — that the FBI was also conducting an investigation into Mr. Marshall's organization. That is, Defendant knew that the FBI was aware that he had been arrested for possession of a relatively small amount of narcotics. He also knew that the FBI was aware of the alleged head of a major narcotics distribution organization, was aware that he had some connection to this individual, and knew that it was this individual that was the focus of their investigation. As an independent act of free will, Defendant chose to cooperate with the FBI rather than fall with the rest of the Marshall organization.

During the second evidentiary hearing held on the instant motion, Defendant's counsel asked Defendant: "You were then delivered to the FBI office here in Bay City. . . . What was your understanding of the purpose of that interview there at the police — I'm sorry, at the FBI office?" Oct. Hr'g 47:13–15. "Um, the drugs that I had got caught with," Defendant responded. Oct. Hr'g 47:16. On cross-examination, the government inquired:

> Q. Mr. Blount, you did testify back in July regarding this hearing, correct?
> A. Yes.
> Q. Do you recall testifying at that time that: "The FBI asked me if I was willing to discuss my involvement with Eric Marshall," and you told them that you were and after that point in time, you signed the Miranda form?
> A. I do recall saying that, yes.
> Q. Okay. You testified otherwise here today. Is there any reason for that or —
> A. After the Court issued the order for the supplemental briefing regarding this hearing, my attorney told me to review the — the statements on the forms or the transcripts of the statements that I had given before and in doing so, I began to recall things differently. And so that's — that would be the reason for the change in my testimony.
> Q. So you're saying your memory here today is better than it was so in July?
> A. Um, different things came to mind after I began reading the transcripts, yes.

Oct. Hr'g 62:5–25.  Defendant's assertion that his memory improved with time is unpersuasive, and his amended version of the circumstances of how he came to execute the *Miranda* waiver and agree to cooperate with the FBI is not credible.  Rather, significant intervening events occurred before Defendant agreed to cooperate and executed the *Miranda* waiver.

### D.

Finally, and most "particularly," the Court must consider "the purpose and flagrancy of the official misconduct," or lack thereof.  *Dunaway v. New York*, 442 U.S. 200, 218 (1979) (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)).  As noted above, "The animating purpose underlying the exclusionary rule is the deterrence of unlawful government behavior." *United States v. Gross*, __ F.3d __, __, 2011 WL 5456694, at *5 (6th Cir. June 15, 2011) (citing *Elkins v. United States*, 364 U.S. 206, 217 (1960)).

In *Brown*, the Court concluded that the government had not met its burden of demonstrating attenuation when because the illegal arrest "had a quality of purposefulness" — "The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives." 422 U.S at 605.  Similarly, in *Dunaway*, the Court found no attenuation because the defendant "admittedly seized without probable cause in the hope that something might turn up."  442 U.S. at 218; *see also Taylor v. Alabama*, 457 U.S. 687, 691 (1982) (same).  Likewise, in *United States v. Lopez-Arias*, 344 F.3d 623 (6th Cir. 2003), the court concluded that the government had not met its burden of demonstrating attenuation when "the illegality of the arrest was blatant."  *Id*. at 630.

In this case, as this Court observed in its previous opinion and order, the official misconduct was "slight."  *United States v. Blount*, No. 09-20536, 2011 WL 3426189, at *6 (E.D.

Mich. Aug. 5, 2011). On the evening of January 27, 2009, a cold evening, even by Michigan standards, Officers Schanck and Petro observed Defendant walking alone in a neighborhood known for an increased amount of drug-related activity. The streets were empty — no cars or other pedestrians were present. Yet Defendant continued to glance from side to side and look behind while talking on a cellular phone. Suspicions aroused, Schanck and Petro stopped their vehicle and approached Defendant. Defendant contends Schanck yelled "stop." Schanck remembers yelling "hi" or "hey." Regardless, it is undisputed that Schanck indicated in a commanding tone that he wanted to speak with Defendant. Defendant stopped, turned around, and waited for Schanck and Petro to approach. At that moment, the Court concluded, he had been stopped for purposes of the Fourth Amendment. Although the officers did not have a sufficient basis for a *Terry* stop, this was not a "blatant" constitutional violation.

As they approached Defendant, Schanck asked Defendant's name, and he responded truthfully. Schanck recognized the name "Earl Blount" as a "person of interest" in the Marshall investigation, the large, ongoing FBI crack cocaine investigation that eventually led to the twenty-five indictments in this case. Defendant was asked for identification and produced a Michigan identification card. Without asking, Petro returned to the patrol car and ran the card through the Law Enforcement Information Network database. Petro was in the patrol car about two minutes. During that time, he retained possession of Defendant's identification card. At that time, Defendant was seized within the meaning of the Fourth Amendment, however, this constitutional violation was not blatant —the officers had observed Defendant walking in a high-drug area and glancing from side-to-side and behind and had recognized "Earl Blount" as a "person of interest" in the Marshall investigation, and had taken his license to conduct a brief

computer search, which lasted about two minutes. Although the officers did not have a reasonable suspicion to believe that Defendant might be involved in criminal conduct, under the totality of the circumstances, the seizure was not a "flagrant" constitutional violation.

Although the consent was given about a half hour after this unlawful seizure, Defendant's consent was the product of Defendant's independent decision and not the product of flagrant official misconduct. Defendant's motion to suppress the statements he made to the FBI following his execution of the *Miranda* waiver will be denied.

**IV.**

Finally, Defendant also moves to suppress information obtained from his cellular phone incident to his consent to the search of the phone. For the reasons set forth above, this consent also reflects Defendant's independent act of free will. Defendant chose to cooperate with the FBI rather than fall with the rest of the Marshall organization. Moreover, the consent to search the phone was given at the conclusion of the FBI interview. Thus, it was more remote temporally from the unconstitutional stop and seizure than the Defendant's initial consent to speak with the FBI, which was before the interview began. And during the course of the two hour interview, the primary topic of conversation was the Marshall organization. *See, e.g.*, July Hr'g 54:17–21; Oct. Hr'g 9:15–17. Thus, if anything his consent to search the phone was more informed — more independently made — than his initial consent to speak with the FBI. These intervening circumstances, coupled with the *Miranda* waiver and the lack of flagrant official misconduct, are sufficient to dissipate the impact of the initial constitutional violation. Information obtained from the cellular phone is admissible.

Finally, it should be noted, the FBI had actual possession of the cellular phone at the time Defendant's consent to search the phone was given, weakening the attenuation, at least in part. The telephone was seized incident to an unlawful arrest by local law enforcement. Had Defendant not consented to the later search by the FBI, the information obtained from the search would have been a fruit of an illegal arrest. Defendant, however, did consent to the search. Consequently, information obtained from the cellular phone is admissible.

**V.**

Accordingly, it is **ORDERED** that Defendant's motion to suppress (ECF No. 346) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that statements made by Defendant to the FBI following his execution of the *Miranda* waiver at 6:01 p.m. on January 27, 2009, and the information obtained from the search of his cellular phone are admissible.

It is further **ORDERED** that, for the reasons stated in this Court's previous opinion and order of August 5, 2011 (ECF No. 415), evidence obtained from the search of Defendant following his January arrest and his statement to officers following his August arrest are not admissible.

                                        s/Thomas L. Ludington
                                        THOMAS L. LUDINGTON
                                        United States District Judge

Dated: November 28, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 28, 2011.

> s/Tracy A. Jacobs
> TRACY A. JACOBS

---